Mr. Justice Huger
delivered the opinion of the court:
The evidence in this case having been properly submitted to the jury, and sufficient in the opinion of the court to support the verdict, the motion for a new trial must fail on the first ground.
Objections to a juror come too late after verdict. It was so ruled in the case of the State vs. Fisher, and has been frequently recognized as settled doctrine in this court.' 'The objections to the foreman however, in this case, was entirely without foundation. He owned no stock in the bank, and could have no other interest in the institution than is common to all the citizens of the state. He does not receive even a pecuniary compensation for his services at the board. Even before trial, such an objection could not have prevailed. The motion for a new trial must therefore fail on both grounds.
Th.o motion in arrest of judgment makes three questions for the consideration of the court.
1st. What are bills of credit within the meaning of the constitution ?
2d. Are the notes issued by the Bank of the State of South-Carolina, such bills of credit ?
3d. If the notes of that bank are bills of credit within the meaning of the constitution, will the passing such bills, knowing them to be counterfeited, be an offence within the meaning of the act?
These questions will be considered in the order in which they are stated.
Whatever doubts may have once existed, it is now well settled, that the different clauses of the constitution are so to bo construed as to affect the purposes for which they were intended. In conformity with this rule, it has been decided, that although the states retain all powers not ta *15 ken away, yet, where a power is granted to the national government, the exercise of which by the stales, would be inconsistent with the grant, that power is constructively withheld from the states. This rule is as applicable to the provisions which limit the powers of the states, as to those which confer powers on the national government. The object of the limitation must give construction to the words in which it is expressed. The words of the constitution are “ no state shall coin money, emit bills of credit, make any thing but gold and silver a legal tender, &c.” The term bill of credit seldom occurs in the books ; but when used, is always synonimous with letter of credit, and this appears to be its only technical signification. In its literal and more general signification, a bill of credit is a promise, undertaking, or order in writing, for the payment of money issued on the credit of some person or persons, or on the credit of some particular fund. In this sense, promissory notes; bonds for the payment of money; certificates of stock; bills of exchange; checks on a bank, and orders drawn by an officer of a government, or a corporation, on funds set apart, and exclusively .appropriated for the redemption of such order, are bills of credit. That “bills of credit” arc not used in their technical sense'in the constitution, is too evident to be disputed. No. evils-had ever been experienced, and none were to be anticipated, from the emission of letters of credit by the states. — • 'That they were not used to the extent of their literal and general signification, is almost as apparent. No injury had been experienced from the states borrowing money, and issuing therefor certificates of stock, or bonds for the payment of money. Nor had hills of exchange, or checks for mq[ney, or orders drawn on particular funds, produced' any of those mischiefs, against which, it can be supposed, the constitution intended to guard. Cotemporaneous constructions of the constitution are to be respected, (Stuart vs. Land, 1 Crunch, 303,) and they have been on these points, in the language of a learned Judge, of the most forcible nature.
*16 Evórjr state in the union has, ever since the adoption of the 'Constitution, issued certificates of stock, bills of exchange, 'orders drawn on particular funds, and in doing so, have never been supposed to violate the constitution. If letters of ’credit; bills'of exchange; bonds for the payment of money ; certificates of stock and orders drawn on particular funds by the officers of government, be not within the meaning of the words bills of credit, as used in the constitution, it would seem to follow that promissory notes or bills issued on the credit of the states, are the bills which it intended to prohibit. This construction deserves some support from the practice of the different states. Although they had been in the habit of emitting these bills in quantities, before the adoption of the constitution,, no one is known to have done so since, unless the notes issued by the bank of this state be such bills. This appears almost to amount to a construction by common consent. A reference however to the peculiar circumstances of the country for years, prior to the adoption of the constitution, will best shew the evil against which the prohibition was intended to guard. Congress not having the power of raising a revenue by taxation, were obliged, throughout the revolutionary war, to issue paper money to defray their experices. The states unwilling to use the power they possessed, pursued the same course, and defrayed their oxpences in paper money of their own creation. These different emissions of paper money constituted the currency of the country. In the resolutions of Congress, as well as the acts of the different Legislatures, these emissions of paper money, were called bills of credit, and were, in fact, promissory notes issued on the credit of the different governments. As no funds were set apart or appropriated for the redemption of these bills, they depended entirely on the faith as well as ability of the different governments for payment, and began to depreciate as soon as they exceeded the purposes of domestic exchange. As issue was made, depreciation followed; and ultimately, so great was the issue by Congress and the states, that $ 100 of this paper was- *17 not worth more than a single dollar in specie. The evils which always attend a depreciating currency were sensibly felt, and in the language of the Historian of Carolina, they were equal to all that could follow an agrarian law. To prevent a recurrence of these evils, which had been produced, in a great measure, by the state governments, they are prohibited from issuing such paper in future; that is, promissory notes, for which, only their faith was pledged. Had adequate funds been appropriated for the redemption of this paper, or could it have been converted, at pleasure, into gold and silver, depreciation would not have taken place, and the evils complained of, would not have been experienced. A bill of credit then, within the meaning of the constitution, is a promissory note or bill issued exclusively on the credit of the state. It has been contended on the part of the state, that a bill of credit within the meaning of the constitution, implies a legal tender. That the states, therefore, are only prohibited the emission of such bills of credit as they shall make a legal tender. Although throughout the resolutions of Congress, and the acts of our Legislature “ paper money” and “ bills of credit” are used as synonimous, it. no where appears that “legal tender” and “bills of credit” were regarded as such. The Legislature of this slate as early as 1704, and frequently afterwards, prior to the revolutionary war, issued bills of credit, without making them a legal tender. Nor were the bills issued by Congress made such by their resolutions. On the contrary, the articles of confederation under which they acted, gave them no power to make a legal tender. And so perfectly was this understood, that it appears, when it was thought necessary to adopt some measure to arrest the progress of depreciation, a resolution was passed, declaring that they ought to be so regarded, and denouncing at the same time all who should not receive them as gold and silver. When it was found that a paper denunciation, although aided by a strong patriotic feeling, was not sufficient to resista moral' necessity, they recommended to the states to make congressional *18 bills of credit a legal tender, which was accordingly done, About the same time, the bills issued by the states were also made a legal tender. But prior to this, the paper money both of the States and Congress were called, and so denominated in their acts and resolutions “bills of credit.” Independanily of the certain import of these words in the resolutions of Congress and the different acts of the Legislature, from which no doubt they were taken by the framers of the constitution, it would be impossible to adopt the construction contended for, without making- the prohibition entirely nugatory. For the words which immediately follow the prohibition, are “ no state shall make any thing but gold and silver a legal tendel-.” If no state can make anything but gold and silver a legal tender, bills of credit could not be emitted as a legal tender, even were the words “ bills of credit” entirely expunged. It cannot be contended that they have no meaning, and if they have any, they must import something else than bills which are a legal tender. The constitution in prohibiting the states from coining money; emitting bills of credit, and making any thing but gold and silver coin a tender in payment of debts, after having given to Congress the powér to coin money and regulate the value thereof, and of foreign coin, (the last of which powers is necessarily exclusive,) evidently intends to place beyond the control of the states, the currency of the nation. The effects of a base currency wore well known to its framers, and they could not have been ignorant of the great inconvenience that must result from having as many different currencies as there were states. Give however to the states the power of emitting bills on their own credit, even though they be not a legal tender, and the currency of the country must be ve~ ly much under their control. It is, then, not only in conformity to the import of the words as used in the resolutions of Congress and the Acts of the Legislature, but to the plain meaning and spirit of the constitution, that bills of credit should not be understood to imply a legal tender.
Having shown that bills of credit, within the meaning *19 pf the constitution, are such bills as were emitted by Congress and the different states, anterior to the adoption of the constitution, and that such were issued exclusively uppn the credit of Congress and the states, — the next question to be considered is, — are the notes issued by the Bank of the State of South Carolina such bills ?
It appears from the charter of the Bank, that its capital was furnished exclusively by the state. That the president and directors ‘who manage its concerns, are all appointed by the state. Its capital consisted of stock of the United States, owned by the slate, which has been converted into money •, stock which the state owned in the different banks of this city, and which had also been converted into money; the bonds due to the Paper Medium Loan Office, alarge proportion of which has been paid; and balances which were in the treasury at different periods, since its establishment. In all, equal to $1,100,000. This capital appears to be as real and substantial as that of any other hank. It is authorized, like other banks to issue notes payable to bearer, and redeemable in gold and silver on demand. The capital is pledged for the payment of these notes; and the president and directors can be sued in the same manner, and with as much facility as those of other institutions. It differs in no respect from the other hanks, but in being owned by the state, and being more restricted in its issue of paper. As in some of the other banks, the stockholders are responsible in thg event of insolvency. A clause in the charter provides for the payment of such drafts as may he drawn by the treasurer of the state. The amount of notes issued depends, within the limits prescribed by the charter, upomlhe discretion of the president and'directors, and their discretion must he governed by the ability of the bank, on the one hand, and the demand for loans, on the other. In this respect, they differ widely from the bills emitted by Congress and the States. — They are redeemable on demand, in gold and silver, and if not paid, according to their tenor, the president find directors arp liablp to an action at law to the holder. *20 hi these respects they differ still more from the revolutionary currency. A note of this bank is an order drawn by the president and directors on the cashier, to pay the bearer the amount of the note, out of the monies provided for that purpose by the state. This does not differ from the orders which have been drawn annually, ever since the adoption of the constitution, by the presidents of the senate, and speakers of the house of representatives on the treasurers, for the pay of the members of the Legislature; or from the orders drawn by the clerks of courts for jurors, or of the treasurer for the payment of the different officers of the government on a bank, in which, the funds of the state may for convenience, have been deposited. It is true, these orders differ from hank notes in form, but not in substance. So little do they differ in form, thatit could be attended with no bad consequences to give to both the same form. Both are bills of credit drawn on a particular fund. Bank notes are bills drawn on the credit of the capital of the bank, vested in the president and directors a® trustees for that purpose, and which cannot morally or legally be diverted to any other purpose, not even by the state. The clause in the charter pledging, over and above the capital, the faith of the state, in case of insolvency, for the redemption of the notes, cannotvary the character of the bill, which is substantially an order on the capital or fund pledged. The faith of the state is equally pledged for the redemption of the orders of the president and speaker and treasurer. Nor can the clause requiring the bank to pay such drafts as may be directed by the Legislature, alter the character of the bills. This when taken in connection with the other clauses of the act, implies no more than an occasional accommodation to the Legislature, which is usually done by all banks to their best customers. But this very provision shews how independent of their control, their Legislature intended to make the institution. As a note of the .Bank of the State, is a bill drawn on the credit of a particular fund, set apart for that purpose, it is not a bill of credit, Xivithin the meaning of the constitution.
Clarke, Elliott and Holmes, for the motioq.
Retigru, Att’y. .(Jen. contra.
The consideration of the third question has become unimportant to this case. Although I entertain no doubts on this question, and regard it as immaterial to the defence, whether the notes of the bank be bills of credit or not, within the meaning of the constitution, yet as some doubts are entertained by one of the members of the bench, the effect probably of its unimportance in this case, the opinión of the court will not now be expressed on this point.
Themotion in arrest of judgment, as well as that for a new trial, must be dismissed.
Justices Nott, Colcock, Bay, Richardson, Johnson and Gantt, concurred.